# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Firas M. Ayoubi (#2012-1207168), ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> Thomas Dart, John Murphy, Tyree Currie, ) <br> and Sgt, Nanos, ) <br> ) <br> Defendants. ) | Case No. 14 C 549 <br><br> Judge Charles R. Norgle |

## MEMORANDUM OPINION AND ORDER

Plaintiff Firas Ayoubi, a Muslim pretrial detainee at the Cook County Jail, brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000cc-1 ("RLUIPA"). Ayoubi contends that Cook County Sheriff Tom Dart and three Cook County Jail employees violated his rights under the First Amendment and the Equal Protection Clause by limiting his ability to attend group Islamic religious services, refusing to provide him with post-Ramadan-fast meal trays in 2013, rejecting his requests for a diet containing Halal meat, and prohibiting him from using a prayer rug and wearing a head garment. Defendants' motion for summary judgment is currently before the Court. Ayoubi has not responded, and the time for doing so has passed. For the reasons stated below, Defendants' motion for summary judgment is granted in its entirety.

**I.       Northern District of Illinois Local Rule 56.1**

Ayoubi, an experienced *pro se* litigator, has filed a total of thirteen civil rights actions in this district, including this one.[1] Because Ayoubi is proceeding *pro se*, Defendants served him

---

[1] Not including this case, Ayoubi has filed the following civil rights lawsuits in this district: *Ayoubi v. Dart*, Case No. 13 C 8343 (N.D. Ill.) (Norgle, J.); *Ayoubi v. Contreras*, Case No. 13 C

with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois Local Rule 56.2 [64]. The notice explains the consequences of failing to properly respond to a motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure 56 and Local Rule 56.1.

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Ibid.* (citing N.D. Ill. R. 56.1(b)(3)(B)).

Although courts construe *pro se* pleadings liberally, *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016), a plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) (holding that

---

8556 (N.D. Ill.) (Chang, J.); *Ayoubi v. Dart*, Case No. 13 C 8983 (N.D. Ill.) (Norgle, J.); *Ayoubi v. Dart*, Case No. 14 C 50 (N.D. Ill.) (Norgle, J.); *Ayoubi v. Przybylo*, Case No. 14 C 51 (N.D. Ill.) (Wood, J.); *Ayoubi v. Mulligan*, Case No. 14 C 602 (N.D. Ill.) (St. Eve, J.); *Ayoubi v. Dart*, Case No. 14 C 1701 (N.D. Ill.) (Norgle, J.) (assessing "strike"); *Ayoubi v. Dart*, Case No. 14 C 1703 (N.D. Ill.) (Norgle, J.) (assessing "strike"); *Ayoubi v. Smith*, Case No. 14 C 3331 (N.D. Ill.) (Castillo, C.J.); *Ayoubi v. CBM Premier Management, LLC*, Case No. 14 C 4306 (N.D. Ill.) (Norgle, J.); *Ayoubi v. Dart*, 14 C 5089 (N.D. Ill.) (Norgle, J.); *Ayoubi v. Cook County Sheriff's Office*, 14 C 5179 (N.D. Ill.) (Norgle, J.) (assessing "strike").

"we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel"); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("even *pro se* litigants must follow procedural rules"). Because Ayoubi failed to respond to Defendants' 56.1 Statement of Material Facts and "district courts may enforce their local rules on how the summary-judgment process is structured," *Olivet Baptist Church v. Church Mutual Ins. Co.*, No. 16-1689, — Fed. App'x —, 2017 WL 129943 (7th Cir. Jan. 13, 2017), the Court accepts all assertions in the Defendants' Statement of Material Facts as true to the extent that they are supported by the record. *See* L.R. 56.1(b)(3)(C); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

## II.  Facts

The following facts are set forth as favorably to Ayoubi as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Firas Ayoubi is a pre-trial detainee at the Cook County Department of Corrections ("CCDOC"). (Defs.' SOF at ¶ 1.) In 2013 and 2014, when the events at issue in this case occurred, he was housed on Tier CF of Division 11 of the CCDOC. (*Id.* at ¶ 4.) At all times relevant to this lawsuit, Defendant Thomas Dart was the Sheriff of Cook County, Defendant John Murphy was the Acting Executive Director of the CCDOC, Defendant Tyree Currie was the Superintendent of Division 11 of the CCDOC, and Defendant Sargent Nanos was a Sergeant in Division 11 of the CCDOC. (*Id.* at ¶ 2.)

Ayoubi alleges that while housed on Tier CF, he was not given adequate access to the Islamic religious services that were provided in Division 11 of the CCDOC, he was not allowed to possess a religious head garment or a prayer rug, and that his religious dietary needs were not

3

accommodated. (*Id.* at ¶ 5.) He also generally alleges that the Defendants violated RLUIPA. (*Id.*) Ayoubi has no additional claims. (*Id.* at ¶ 41.) Specifically, during his deposition, he testified, "I think that's about it . . . . I believe so, yes," when asked if he had any other claims and later repeated that to the best of his knowledge, he had "no other claims." (*Id.*, citing Pl's Dep. at 66:1-6; 103:16-24.) He further testified that he was satisfied with the answers he provided at his deposition and had nothing to add. (*Id.*)

### A. Religious Services

#### 1. CCDOC Policies

At the relevant times, CCDOC General Order 14.20 was in effect. (*Id.* at ¶ 16.) It contains CCDOC's policy allowing detainees to practice their religion as freely as possible consistent with the operational and security requirements of a correctional institution. (*Id.*) It further provides that it is the responsibility of all CCDOC staff to provide the detainee population with equitable access to the religious services of their preference, within the parameters of the General Order and the safety of the detainees and institution. (*Id.* at ¶ 17.)

Superintendents and correctional staff within each division of the CCDOC are responsible for ensuring that the CCDOC's policies, practices, and procedures regarding the availability of religious programming services are properly implemented and that the operational requirements and safety needs of detainees and staff are met. (*Id.* at ¶ 21.) Religious services are performed by approved volunteers from various religious communities. Neither the Cook County Sheriff's Office nor the CCDOC employs religious volunteers. (*Id.*) The scheduling of religious services is a coordinated effort between the approved religious volunteer(s), the superintendents of each division, and the CCDOC's Administrative Offices. (*Id.* at ¶ 18.) The scheduling of religious

4

services is dependent on volunteers' schedules, space availability for services, and the security needs of the various divisions within the CCDOC. (*Id.* at ¶¶ 18, 23.)

In 2013 and 2014, if a particular religious service was scheduled, detainees who had their dayroom period at that time were permitted to attend. (*Id.* at ¶ 24.) Detainees who were in their cells during a dayroom period were not permitted to attend religious services for security reasons. (*Id.*)

Divisional lockdowns can occur due to staff shortages and security concerns. (*Id.* at ¶ 19.) Superintendents and correctional staff in each division assist during divisional lockdowns (a security measure in which all non-essential movement within the division is terminated for the security and safety of the detainees and staff). (*Id.* at ¶ 19.) During a divisional lockdown, activities that require the movement of inmates within the division, such as linen exchanges, recreation, and religious services, can be cancelled and rescheduled for security and operational reasons. (*Id.* at ¶ 20.) In 2013 and 2014, divisional lockdowns, staff shortages, or the failure of a registered religious volunteer to appear were the only reasons that the CCDOC did not offer religious programming services for observant detainees. (*Id.* at ¶ 25.)

### 2. Ayoubi's Testimony

According to Ayoubi, when he was housed in Division 11, CCDOC policies did not require correctional officers to allow him to attend Muslim services with adequate frequency. (*Id.* at ¶¶ 6, 8.) Ayoubi testified at his deposition that the majority of his claims about access to Muslim religious services occurred in 2013. (*Id.* at ¶ 6.) During that time, an Imam led services that lasted between 20 and 90 minutes. (*Id.* at ¶ 7.) He did not recall how many Muslim services he attended in 2013. (*Id.*) He also could not specify dates or months he had purportedly inadequate access to

5

Muslim religious services, how many times he attended Muslim services, or how many times he was not allowed to attend Muslim services. (*Id.* at ¶ 9.) At his deposition, when asked to provide a specific number, he testified that he did not get called to attend Muslim services "between two to four months, here and there . . . [s]ometimes it could be consecutive, sometimes it would be sporadic." (*Id.* at ¶ 9, citing Pl.'s Dep. at 22:5-9.) He agreed that if there were limits on the number of detainees who were permitted to attend Muslim services in 2013, it was because of space limitations or security concerns. (*Id.* at ¶ 10.)

In 2014, Ayoubi attended Muslim services more frequently than in 2013. At this time, the CCDOC had a "security list" of detainees who wanted to attend Muslim religious services. (*Id.* at ¶ 12, citing Pl.'s Dep. at 37:2-12.) He was on the list, but did not know why. (Defs.' SOF at ¶ 12.) Once the list system was on place, detainees housed on his tier whose names were on the list would be called by name to attend the Muslim services when they were offered (*e.g.*, "Inmate X, Inmate Y, and Inmate Z" would be called, as opposed to a general announcement of "Muslim Services"). (*Id.* at ¶ 13.) Inmates on the list could refuse to attend services; if so, they would have to sign the list to acknowledge their refusal. (*Id.*) Ayoubi refused to attend Muslim services in 2014 when he needed to call his attorney or family, and indicated his reason for doing so on the list. (*Id.*, citing Pl.'s Dep. at 41:15-20.)

Ayoubi testified that during the time period at issue, he was able to "practice his faith," pray in his cell and in the dayroom, and pray five times a day. (*Id.* at ¶ 14, citing Pl.'s Dep. at 50:24-51:3.) As he put it, "I pray when I need to pray." (*Id.*, citing Pl.'s Dep. at 68:12-17.) He also prayed and discussed spirituality "all the time" with other Muslim inmates living on his tier in 2013 and 2014. (*Id.*, citing Pl's Dep. at 44:8-12.) In addition, Ayoubi was able to speak with his

Imam while he was housed on Tier CF. (*Id.* at ¶ 15.) He testified that he did not discuss this case with his Imam, and his Imam never told him that he thought his access to Muslim services was inadequate. (*Id.*)

### B. Prayer Rugs and Garments

Ayoubi's second claim is that he was deprived of religious prayer rugs and head garments while incarcerated in CCDOC. (*Id.* at ¶ 26.) He testified at his deposition, however, that religious prayer rugs and head garments are not requirements in the Muslim faith. (*Id.*) He was able to pray while kneeling on a linen sheet in the Tier CF dayroom and while kneeling on a CCDOC shirt in his cell. (*Id.* at ¶ 27.)

CCDOC General Order 14.20 provides a guideline of religious items which shall be considered contraband, including but not limited to religious head coverings and caps, religious prayer shawls, robes and accessories, religious prayer mats/rugs, hard cover prayer books, religious beads and religious insignia and/or sacrament that can be used as, or fashioned into a weapon. (*Id.* at ¶ 29.) Ayoubi was aware that pursuant to a CCDOC General Order, detainees cannot possess prayer rugs and head garments because they are considered to be security risks. (*Id.* at ¶ 28.)

### C. Religious Diet

Ayoubi's third claim relates to his diet and has two sub-parts. First, he contends that the CCDOC did not provide him with the three daily meal trays at the end of the day during Ramadan in 2013 so the accumulation of a variety of foods would be available when he broke his religious fast. Second, he challenges CCDOC's decision to offer him a vegan diet to accommodate his religious beliefs, as opposed to a diet containing Halal meats.

7

### 1. Food Trays During Ramadan in 2013

During the month of Ramadan, practicing Muslims are not supposed to eat or drink anything from approximately sunrise to sunset. (*Id.* at 36.) Ayoubi testified at his deposition that the CCDOC generally requires inmates to consume their meal trays within an hour, "which is understandable, obviously, for sanitation reasons." (*Id.* at ¶ 31, citing Pl.'s Dep. at 70:4-8.) This rule was "not just during Ramadan"; "if any inmate decides to save their food, they [CCDOC staff] toss it" because it is considered contraband (*Id.*, citing Pl.'s Dep. at 18-21.)

Ayoubi contends that during the month of Ramadan in 2013, he was not allowed to keep his three daily meal trays in his cell, so he could not consume food from the trays after he broke his religious fast. (*Id.* at ¶ 30.) However, during Ramadan in both 2013 and 2014, he purchased food items from the commissary, such as chili, tuna, mackerel, and Halal meats that bore the Halal symbol on the packaging. (*Id.* at ¶ 32.) Ayoubi stored his purchased food items in a box in his cell. (*Id.* at ¶ 33.) He was able to access his purchased food when he was ready to break his fast during Ramadan, and no one ever took his purchased food away from him. (*Id.*) During Ramadan in 2014, CCDOC staff provided detainees participating in Ramadan with the three daily trays so he was able to consume them when he was ready to break his fast. (*Id.* at ¶ 34.)

### 2. Halal Meats

CCDOC has a procedure that allows detainees to obtain approved religious diets. (*Id.* at ¶ 39.) The approved diets offered to detainees pursuant to the contract with the CCDOC's food services include a Lacto-Ovo Vegetarian Kosher diet, a Lacto-Ovo Vegetarian Certified diet, and a Vegan Certified diet. (*Id.*)

Halal meats are from animals that are killed in a manner that complies with Muslim beliefs.

8

(*Id.* at ¶ 36.) According to Ayoubi, if Muslims eat meat, it should be Halal meat. (*Id.*) Eating a vegan diet does not violate Ayoubi's Islamic beliefs or the basic tenants of the Muslim faith because a vegan diet does not include non-Halal meat. (*Id.* at ¶ 38.) Ayoubi contends that CCDOC should have provided him with a diet that included Halal meats. (*Id.* at ¶ 35.) Ayoubi thus asked CCDOC personnel for a diet that complied with Muslim Halal requirements. (*Id.* at ¶ 37.) In response, he was offered a vegan diet. (*Id.*) He rejected the vegan diet based on his position that he was not vegan because he ate meat. (*Id.*) When he complained, CCDOC personnel sent him a letter explaining that the vegan and vegetarian diets offered by the CCDOC met the requirements of a Halal diet and were nutritionally sound. (*Id.*)

### D. RUILPA

Ayoubi's fourth claim is based on RUILPA. (*Id.* at ¶ 40.) At his deposition, he explained that this claim is based on his belief that Cook County receives federal funding to provide food and services to CCDOC detainees. (*Id.*) According to Ayoubi, his religious services, dietary, and prayer rug/head garment claims demonstrate that CCDOC has violated RUILPA

### E. Allegations Directed at the Defendants

Ayoubi testified at his deposition that he could not point to evidence indicating that Sheriff Dart or CCDOC Acting Executive Director Murphy personally deprived him of access to Muslim services at the CCDOC, or were in any way involved in his events underlying his claims. With respect to Superintendent Currie and Sergeant Nanos, Ayoubi contends that they were personally involved in the alleged deprivation of religious services because they are supposed to review statistical data about religious services. (*Id.* at ¶ 43.) He also contends that on one occasion, he asked Superintendent Currie why he could not attend Muslim services. (*Id.*, citing Pl.'s Dep. at

31:9-32:8.) Ayoubi has never spoken with Defendants Dart, Murphy, or Nanos. (*Id.* at ¶ 45.) He seeks money damages from each Defendant. (Sec. Am. Compl. at p. 21.)

In support of his claims based on religious diets and the food offered at the CCDOC during Ramadan in 2013, Ayoubi's evidence supporting his position that the Defendants were personally involved consists of the grievances he filed which were handled by Currie, letters he wrote to Dart, General Orders, and the CCDOC's contract with its food services provider. (Defs.' SOF at ¶ 46.) Ayoubi conceded at his deposition that Defendant Nanos was not involved with his request for a diet containing Halal meat. (*Id.*) In support of his RUILPA claim, Ayoubi relies on the evidence supporting his three other claims. (*Id.* at ¶ 44.)

### III. Legal Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

Parties seeking summary judgment have the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving parties demonstrate the absence of a

disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

## IV. Discussion

The Court allowed Ayuobi to proceed with First Amendment, RLUIPA, and Equal Protection Clause claims against Sheriff Tom Dart, Acting Executive Director Murphy, Superintendent Currie, and Sergeant Nanos. For the following reasons, Defendants are entitled to summary judgment as to all of these claims.

### A. First Amendment & RLUIPA

Ayoubi's claims concerning his religious rights arise under the free exercise clause of the First Amendment and RLUIPA. Inmates' First Amendment rights are "subject to limits appropriate to the nature of prison life" so "[r]estrictions are permissible if they are reasonably related to legitimate penological objectives." *Vinning-El v. Evans*, 657 F.3d 591, 592-93 (7th Cir. 2011). To survive summary judgment as to his First Amendment claims, Ayoubi must identify evidence suggesting that Defendants "personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379-80 (7th Cir. 2016). Courts consider four factors when reviewing whether restrictions on access to religious services and other opportunities are justifiable: (1) whether there is a valid and rational connection between the regulation prohibiting access and a legitimate governmental interest to justify it; (2) whether there are alternative means of exercising the right to practice religion that remain open to inmates; (3)

11

whether accommodation of the right to practice would have a significant impact on prison staff or other inmates; and (4) whether the regulation reasonably allows inmates to avail themselves of available alternatives. *Turner v. Safley*, 482 U.S. 78 (1987). In turn, "[a] substantial burden 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Thompson*, 809 F.3d at 379-80 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981)).

Inmates are entitled to broader religious protection under RLUIPA. *Holt v. Hobbs*, 135 S. Ct. 853, 859-60 (2015). RLUIPA prohibits institutions that receive federal funding from imposing a "substantial burden" on an inmate's religious exercise unless the disputed measure is the least restrictive way to advance a compelling state interest. *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006); *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003). A "substantial burden" on religious exercise is "one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). However, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety" so each "accommodation must be measured so that it does not override other significant interests." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005).

### 1. Muslim Services

The record demonstrates that in 2013 and 2014, divisional lockdowns, staff shortages, or the failure of a registered religious volunteer to appear were the only reasons that the CCDOC did not offer religious programming services for observant Muslim detainees on Ayoubi's housing tier. At his deposition, Ayoubi agreed that in 2013, when the CCDOC limited the number of detainees who could attend Muslim services, it did so due to space limitations or security concerns.

12

He also testified that he was able to attend Muslim services in 2014 except when he elected to attend to other matters, such as telephone calls with his attorney or family. During 2013 and 2014, he further agreed that he was able to practice his faith, pray as desired, pray and discuss spirituality with other Muslim inmates, and speak with his Imam.

The cancellation of religious services at the Cook County Jail due to "divisional lockdowns, staff shortages, or [because] the Muslim volunteer does not appear to conduct services" is based on legitimate governmental interests. *Walker v. Dart*, No. 09 C 1752, 2010 WL 3307079, at *10 (N.D. Ill. Aug. 19, 2010) (collecting cases). Moreover, Ayoubi has acknowledged that CCDOC canceled group services due to space limitations and security concerns, both of which are valid issues that impact prison staff and other inmates and the necessity to allocate the Jail's resources to maintain security and treat inmates of different religions equally. *See id.* As noted by Defendants, Ayuobi has not pointed to any alternative ways to allow group Muslim services to take place during lockdowns, when staffing levels are inadequate, or when volunteers are unavailable. Nothing in the record suggests that the security or staffing concerns asserted by Defendants were pretextual, the unavailability of Muslim volunteers was attributable to Defendants, or "the security measures were applied in a discriminatory manner, affecting only Muslim inmates." *Id.* And critically, although some group services did not proceed, when necessary, Ayoubi had—and took advantage of—ways to exercise his right to practice his religion other than by participating in group services. *See id.* at *11 (holding that a Muslim inmate's ability to pray in his cell throughout the day, study the Quran, and reflect on scriptures was an adequate alternative to the group practice of religion).

Moreover, to the extent that Ayoubi contends that Dart should be held liable in his official

13

or individual capacity because the CCDOC had an unconstitutional policy of denying Muslim inmates the ability to practice their faith, his claim is unavailing.[2] "Official capacity suits are a way of suing the governmental entity of which the defendant official is an agent." *Kaszuba v. Godinez*, No. 14-CV-00952-JPG, 2015 WL 5935216, at *2 (S.D. Ill. Oct. 13, 2015) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Liability in an official capacity action flows from the execution of an official policy, practice or custom by a government official. *Id.* To establish an official policy or custom, "a plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the [public entity], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *La Playita Cicero, Inc. v. Town of Cicero, Illinois*, 175 F. Supp. 3d 953, 971 (N.D. Ill. 2016) (quoting *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467–68 (7th Cir. 2010)).

Here, the only policy that limited religious services did so due to security, staffing, or volunteer issues. When these concerns led to cancellation of formal group services, Ayoubi was able to practice his religion by himself, as well as engage in prayer and spiritual discussions with other Muslim detainees. In addition, during his deposition, Ayoubi was unable to identify the

---

[2] The lack of a viable official capacity claim dooms all of Ayoubi's RLUIPA claims, as RLUIPA does not allow personal capacity claims against individual defendants because they do not receive federal funds. *See Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) (holding that the "RLUIPA does not authorize any kind of relief against public employees, as opposed to governmental bodies that receive federal funds and accept the conditions attached by the statute"); *Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir. 2009) ("we decline to read RLUIPA as allowing damages against defendants in their individual capacities"); *see also Beamon v. Dittmann*, No. 14-CV-136, 2015 WL 3952872, at *1 (E.D. Wis. June 29, 2015) (denying motion for leave to file an amended complaint adding a RLUIPA claim where the plaintiff sought monetary damages from defendants sued in their individual capacities, which are not available under RLUIPA).

number of occasions when group services were canceled, so no evidence shows that the issue was anything other than an isolated reaction to specific institutional needs. *See Nettles-Bey v. Burke*, No. 11 C 8022, 2015 WL 4638068, at *12 (N.D. Ill. Aug. 4, 2015) ("Isolated incidents of allegedly unconstitutional conduct are insufficient to establish a widespread practice.").

Finally, Ayoubi's only evidence about any Defendant's personal involvement with religious services is his testimony that he asked Superintendent Currie once why he could not attend Muslim services, as he stated that he has never spoken with Defendants Dart, Murphy, or Nanos. Section 1983 creates a cause of action based on personal liability and predicated on fault so to be held liable, an individual must have caused or participated in a constitutional deprivation. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012); *Pepper v. Vill. of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005). There is no *respondeat superior* (*i.e.*, supervisory) liability under § 1983. *See Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008). Instead, supervisors can be held responsible for the constitutional violations of their subordinates only if the violation occurred at the supervisor's direction or with his or her knowledge and consent. *See Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). Given the lack of evidence suggesting that Defendants were personally involved in the alleged constitutional deprivation, they cannot be held liable.

For all of these reasons, there is no triable issue of material fact as to Ayoubi's religious services claim and Defendants are entitled to summary judgment on this claim. Accordingly, the Court need not reach their fallback argument about qualified immunity.

### 2. Religious Diet

The Seventh Circuit has "repeatedly held that forcing an inmate to choose between daily

nutrition and religious practice is a substantial burden" on religion. *Thompson v. Holm*, 809 F.3d 376, 380 (7th Cir. 2016). Ayoubi challeges CCDOC's practice in 2013—which was changed in 2014—of not providing meal trays to inmates observing Ramadan so they could eat at the end of the day when they broke their religious fast, and its refusal to provide him with a diet containing Halal meats.

With respect to the meal trays, Ayoubi testified at his deposition that the practice in effect during Ramadan in 2013 required him to purchase food in the commissary, since he did not receive meal trays at the end of the day and he was fasting during standard dining hours. He bought items from the commissary, such as chili, tuna, mackerel, and meats that bore the Halal symbol on the packaging, so he would have food at hand when he was ready to consume it. Ayoubi's ability to purchase food (albeit at his expense) so that he could maintain adequate nutrition while hewing to his religious beliefs means that his 2013 Ramadan meal tray claim is unavailing. See *DeJesus v. Bradt*, 174 F. Supp. 3d 777, 787 (W.D.N.Y. 2016) (rejecting inmate's claim that he was entitled to a certain amount of time to consume the evening meal during Ramadan because he was able to store food in his cell to consume as desired); *Dolan v. Lowe*, No. 3:14-CV-1436, 2016 WL 1128016, at *7 (M.D. Pa. Mar. 18, 2016) (granting summary judgment to defendants as to inmate's challenge to the lack of food after sundown during Ramadan because "[t]here is no indication that he was denied other means of practicing his religion such as purchasing food from the commissary and eating that food after sundown").

Similarly, Defendants are entitled to summary judgment on Ayoubi's Halal meat diet claim. Ayoubi also contends that he should have received a diet that included Halal meats because the practice of his religion does not forbid him from consuming meat. However, he agreed that

16

eating meat is a not a central religious belief in the Muslim faith and that eating a vegan diet does not violate his Islamic beliefs. Ayoubi's preference for a diet that includes meat instead of a vegan diet that comports with his faith is, therefore, not enough to survive summary judgment. *See Ajala v. West*, No. 13-CV-544-BBC, 2014 WL 6607428, at *1 (W.D. Wis. Nov. 19, 2014) (because plaintiff did not assert that his diet must include Halal meat, "he cannot argue successfully that his religious exercise was burdened, substantially or otherwise"); *Taylor v. Cook Cty.*, No. 11 C 7427, 2013 WL 2285806, at *7 (N.D. Ill. May 23, 2013) (concluding that a vegan diet is consistent with RLUIPA and the First Amendment because it was sufficiently nutritious and does not violate plaintiff's faith, despite plaintiff's preference for a diet that contains Halal meat).

### 3. Prayer Rugs and Head Garments

Next, Ayoubi asserts that he was entitled to use religious prayer rugs and head garments. He testified at his deposition that his Muslim faith does not require him to use these items, that he could and did worship without them, and that the CCDOC prohibits detainees from possessing these items because they are a security risk. A CCDOC General Order includes "religious head coverings and caps" and "religious prayer mats/rugs" in a list of items that are prohibited because they "can be used as, or fashioned into a weapon." (Defs.' SOF at ¶ 29.) Given this record and the absence of any evidence undercutting the CCDOC's proffered and facially valid security concerns, Defendants are entitled to summary judgment on Ayoubi's prayer rug/head garment claim. *See Holt*, 135 S. Ct. at 862 (an inmate bears the burden of showing that a correctional institution's policy substantially burdens his ability to exercise his religion); *see also Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009) (considering whether inmate's requests for religious items "posed a security risk to the institution or were incompatible with his detention"); *LaPointe v. Walker*, No.

06-952-DGW, 2010 WL 3724274, at *4 (S.D. Ill. Sept. 15, 2010) (granting summary judgment to defendants where plaintiff conceded that a prayer rug was not required by his faith and that he could kneel on other items while praying without violating his religious beliefs, and the ban on prayer rugs was based on the security concern that it could be used to hide contraband).

### B. Equal Protection

The Court allowed Ayoubi to proceed with an equal protection claim based on his allegation that "[t]he adherents of other faiths are treated better than [M]uslims." (Sec. Am. Compl. at ¶ 10.) At his deposition, however, he agreed that he had no claims other than the religious services, 2013 Ramadan meal tray, Halal meat, prayer rug/head garment, and RLUIPA claims. Thus, he has waived any equal protection claim.

In any event, any equal protection claim could not survive summary judgment. An inmate's belief that he was subjected to unfair treatment, without more, does not create a triable question of fact supporting a viable equal protection claim. *Huebschen v. Department of Health and Social Services*, 716 F.2d 1167, 1171 (7th Cir.1983); *Holloway v. Griffin*, No. 14-CV-3209, 2016 WL 525991, at *3 (C.D. Ill. Feb. 9, 2016) (collecting cases). Instead, to establish a violation of the Equal Protection Clause, Ayoubi must establish that "the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). To show discriminatory effect, he "must show that he is a member of a protected class and that: (1) he is similarly situated to members of the unprotected class, (2) he was treated differently than members of the unprotected class, and (3) the defendant acted with discriminatory intent." *Allen v. Hasemeyer*, — Fed. App'x —, No. 16-1077, 2017 WL 213184, at *1 (7th Cir. Jan. 18, 2017) (citing *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir.

2000)). With respect to discriminatory purpose, he must show "more than . . . intent as awareness of consequences." *Mehta v. Vill. of Bolingbrook*, No. 12 C 6216, 2016 WL 3976999, at *4 (N.D. Ill. July 25, 2016) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)).

Here, the Court's consideration begins and ends with the undisputed fact that, to the extent any Defendant was personally involved in the alleged constitutional deprivations, the challenged limitations were motivated by various combinations of security concerns, space constraints, volunteer issues, sanitation considerations, and the application of a uniform policy governing request for religious diets. *See Allen*, 2017 WL 213184 at *1 (speculation that plaintiff was treated differently than similarly situated white and Hispanic inmates was insufficient to survive summary judgment given the lack of evidence suggesting that the defendants were motivated by discriminatory bias); *Ajala*, 2014 WL 6607428, at *1 (rejecting equal protection claim "because defendants had a secular reason for providing the vegetarian diet" so "plaintiff cannot show that defendants were discriminating against him on the basis of religion").

Accordingly, Defendants' motion for summary judgment is granted. If Ayoubi wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If he appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Ayoubi could be assessed another "strike" under 28 U.S.C. § 1915(g). If Ayoubi seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Ayoubi need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Ayoubi wishes the Court to reconsider its judgment, he may file a motion under

Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

### IV. Conclusion

For the above reasons, Defendants' motion for summary judgment is granted in its entirety. As Plaintiffs Chante Johnson and Leon Banks recently signed stipulations to dismiss, this opinion resolves all remaining claims as to all parties. Accordingly, the Clerk is directed to enter final judgment in favor of Defendants.

ENTER: _____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: January 31, 2017